IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| JAMES J. MCMAHON, JR., | ) | Case No. 10 C 50149 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.     Introduction**

James J. McMahon, Jr. ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before

the Magistrate Judge pursuant to the consent of both parties. *See* 28 U.S.C. § 636(c); Fed. R. Civ.

P. 73.

**II.     Administrative Proceedings**

On March 29, 2007, Claimant filed for DIB, alleging an onset date of August 5, 2006.

(Tr. 59, 94.) Claimant's initial application for DIB was denied on May 23, 2007. (Tr. 61.) His

claim was denied a second time upon reconsideration on August 6, 2007. (Tr. 69.) Claimant then

filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on  August 22,

2007. (Tr. 73.)

1

The hearing took place on May 28, 2008. (Tr. 32.) Claimant appeared and testified with his attorney present. (Tr. 32.) No medical or vocational experts were called to testify during the hearing.

On November 26, 2008, the ALJ found Claimant disabled from his August 5, 2006 onset date to May 28, 2008, but not disabled thereafter. (Tr. 14-29.) Appeals Counsel denied Claimant's request for review on April 17, 2010. Therefore, the ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481. Claimant filed a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. § 405(g).

### III.    Background

Claimant was born on January 15, 1961, making him forty-seven years old when he appeared before the ALJ. (Tr. 38.) At that time, he resided in Huntley, Illinois with his wife and daughter. (Tr. 38.) Claimant weighed approximately 370 pounds and stood six feet tall. He graduated from high school and achieved the rank of "journeyman carpenter," working in the construction industry for most of his life. (Tr. 39, 50.) At the time of the hearing, Claimant had been unemployed since his alleged onset date of August 5, 2006. (Tr. 38.)

Claimant's previous employment as a carpenter and concrete worker required him to layout and set concrete basements, footings, foundations, sidewalks, driveways, and floors. (Tr. 115.) He often worked with heavy tools such as shovels, picks, hammers, power-saws, nail guns, and drills. (Tr. 115.) Claimant's carpentry work included building homes, additions, and outbuildings. (Tr. 115.) Theses jobs would regularly require Claimant to lift various items weighing 100 pounds or more. (Tr. 116.)

2

In August of 2006, Claimant began experiencing severe pain in his leg. (Tr. 114.) After visiting several doctors and specialists, Claimant underwent lumbar-fusion surgery in October of that year. (Tr. 114.) In September and October of 2007, Claimant underwent two knee-replacement surgeries. (Tr. 416.) At the time of the hearing, Claimant was taking Meloxicam for arthritis and Gabapentin for nerve pain. (Tr. 43.)

He described his back pain to the ALJ as a twenty-four hour "aggravating sensation" between his shoulder blades and back. (Tr. 43.) Additionally, he has "a bit of numbness . . ., a tingling . . ., mostly on the left side of [his] face." (Tr. 43.) He also experiences a sensation of "sitting on wire brushes" in his posterior. (Tr. 43.) Claimant testified that these symptoms do not seem to bother him a lot if he is inactive. (Tr. 43.) However, if he is "doing a lot," the symptoms seem to flare-up. (Tr. 43.)

Claimant's present secondary pain is related to his knee surgeries. (Tr. 50.) The surgeries took away the "grinding" pain, but he still experiences discomfort with the scars and "where the metal parts have joined the bone." (Tr. 50.) Notably, Claimant states that the knee pain was "unbearable" before his surgeries. (Tr. 50.) However, the pain is now "tolerable." (Tr. 50.)

Generally, Claimant is able to walk for twenty minutes before he needs to rest. (Tr. 45.) He can stand still for about ten minutes; then he will need to shift his weight. (Tr. 45.) For at least a month following his fusion surgery, Claimant was dependant on using a walker. (Tr. 243.) When Claimant now shops at a grocery store, he uses a shopping cart for balance and posture. (Tr. 46.) He reported that he still needs a "good handrail" in order to move up a full set of stairs. (Tr. 47-48.) Otherwise, Claimant does not have much trouble getting around his home. (Tr. 48.)

During the hearing, Claimant testified that his typical day now consists of doing random jobs and chores for his friends and family. (Tr. 39, 45.) He will usually wake up around 7:00,

3

take his medications, and step outside to get the newspaper. (Tr. 39.) He also likes to spend some time working in a workshop that he maintains in his garage. (Tr. 39.) Claimant will often visit his elderly parents in the mornings for coffee, as they only live "five [or ten] minutes away." (Tr. 39.) If there are any small chores to be done there, he will try to help with those as well. (Tr. 39.) By mid-morning, Claimant returns home and likes to run errands for his wife. (Tr. 39-40.) These errands may include banking, shopping, or dropping off items at the library. (Tr. 39-40.)

Around noon, Claimant returns home to take his medications again. (Tr. 40.) Then he will need to sit down and rest. (Tr. 40.) Sometimes during his break he will fall asleep in his recliner. (Tr.40.) Claimant testified that he habitually rests for roughly two hours in the afternoon. (Tr. 40.) Afterwards, at 2:00 he will go outside and do yard work or he will go to his workshop. (Tr. 40.)

Prior to his injury, it used to take Claimant two hours to mow his lawn. (Tr. 42.) Now, he testifies, he needs to split the work up into two days. (Tr. 42.) Claimant testified that everything he does now takes twice as long as it had before his injury, but he tries to stay busy. (Tr. 42.) "I just don't like sitting in the house, doing nothing," he testified. (Tr. 40.)

Generally, around 4:00 in the afternoon, Claimant will "get pretty stiff, pretty sore, [and] pretty tired." (Tr. 40.) Even so, he will get cleaned up to help prepare dinner, or he will do other chores: such as emptying the dishwasher. (Tr. 40.)

Often Claimant will need to take a day to "sit around and . . . do nothing . . . because [his back and neck are] sore." (Tr. 40.) "It will go in spurts. Sometimes, . . . if [I] really overdo it, [it] might be every couple of weeks [that I will] have a [few] days like that," he testified. (Tr. 40.)

When the ALJ asked if Claimant could perform a simple job where he would be able to sit or stand when he wanted, and would not be required to lift much weight, Claimant responded

4

that "[t]he sitting part would really be a plus." (Tr. 41.) Claimant stated that he had a similar arrangement setup in his workshop at home, where he could choose to work in a chair or standing up. (Tr. 41.) Yet, when Claimant's attorney asked whether he could work for forty hours a week, for eight hours a day, Claimant answered that he could not. (Tr. 54.) He explained that he could only work from fifteen to twenty minutes before he would need to take a break and walk around. (Tr. 55.) Furthermore, he testified that he was only able to work in his workshop for "maybe an hour" at a time. (Tr. 55.)

IV.    **Medical Evidence:**

   **A. Back Pain**

   After experiencing severe pain in his left leg, Claimant entered Centegra Health System and had a unilateral duplex venous ultrasound, on August 7, 2006. (Tr. 163.) The ultrasound was "negative for deep vein thrombosis," reported Dr. Donald Kennard. (Tr. 163.)

   On August 10, 2006, Claimant reported to the Memorial Medical Center and underwent magnetic resonance imaging ("MRI") of his lumbar spine. (Tr. 159.) The MRI revealed "[d]egenerative disc disease at L1-2, L2-3,-L3-4, and L4-5. The most significant findings include severe neural foraminal narrowing on the right at the L2-3 level and bilaterally at L4-5 . . ., worse on the left than the right." (Tr. 159.) Dr. Khaja A. Nasaruddin recommended Claimant try epidural steroid injections, Norco, and Flexeril for treatment of pain. (Tr. 173.)

   Claimant visited the Pain Center of McHenry County to see Dr. Nasaruddin on August 17, 2006. (Tr. 174.) Dr. Nasaruddin reported Claimant complained of "left buttock and leg pains for [the] past two weeks. No history of injury. The pain is constant and is described as [a] dull ache[,] and at times [is] sharp and burning." (Tr. 174.) Claimant's physical examination revealed

5

that Claimant displayed a limping gait and the range of motion in his lumbar spine was restricted and painful. (Tr. 174.) Dr. Nasaruddin's impression was that Claimant suffered left lumbar radiculopathy. (Tr. 174.)

Dr. Nasaruddin administered an L5 lumbar epidural steroid injection to Claimant on August 18, 2006. (Tr. 168.) Another steroid injection was administered to the L4-5 level on August 25, 2006. (Tr. 166.) Claimant was seen for a follow-up appointment and reported that his symptoms had not improved after the epidural injections. (Tr. 175.)

Following the injections, Claimant visited orthopedic surgeon Dr. Michael S. Roh at the Rockford Spine Center ("RSC") on September 12, 2006. (Tr. 187.) Dr. Roh reported that

> [Claimant] states that his pain has been bothering him for approximately . . . six weeks and it has been increasing in severity over that time. He describes his symptoms as a burning achy-type pain[.] [It is] constant for the most part, but is made worse with activity and relieved somewhat with rest. He is on Norco and states that it does not give him much relief. . . . He denies any accident or injury that brought on these symptoms. . . . [h]e states that the buttock pain is the most severe. He has had two cortisone injections, . . . both of which only gave him an hour . . . of relief.

(Tr. 187.)

Dr. Roh concluded that Claimant's pain had come from "the foraminal stenosis in the lower lumbar spine" and Claimant had "bilateral pars interarticularis fractures at the lowest level in his lumbar spine, which is also contributing to the foraminal stenosis." (Tr. 189.) Dr. Roh discussed many treatment options, including surgery, with Claimant and his wife. (Tr. 189.) Claimant stated that "he would like to go ahead with the surgical procedure, since at this time he is in agony and . . . has no real quality of life." (Tr. 189.)

6

On October 12, 2006 Claimant saw Dr. Roh at RSC for a preoperative consultation. (Tr. 186.) Claimant elected to undergo spinal fusion surgery scheduled for October 16, 2006. (Tr. 186.) Dr. Roh explained to Claimant that the "surgery is to make him better . . . but definitely not perfect." (Tr. 190.) "[T]here is no way that we can make [Claimant] completely pain free for the rest of his life and he understands that." (Tr. 190.)

Dr. Roh performed the spinal fusion surgery on October 16, 2006. (Tr. 200.) The surgery included L4 to S1 posterior spinal fusion, "iliac crest bone graft[,] and [bone morphogenetic protein.]" (Tr. 200.) Claimant was released from St. Anthony Medical Center four days after his surgery. (Tr. 200.)

On November 6, 2006, the RSC nurse record affirmed that Claimant was "up [and] about." (Tr. 243.) However, Claimant was still using a walker for safety and he was instructed to "wean off" of it and "let his own muscles hold him up." (Tr. 243.) Claimant was given refills of his pain medications, Norco and Oxycontin. (Tr. 243.)

From December 2006 through March 2007, Claimant was involved in a physical therapy program at Orthopedic Rehab Specialists ("ORS"). (Tr. 218-232.) Initial reports from this time period show that Claimant felt that his condition and mobility was improving with various exercises. (Tr. 218-219.) In late December, Claimant began to report stiffness and pain in his thoratic and lumbar region, but continued to make progress toward his therapy goals. (Tr. 219.)

In early January, Claimant complained of knee and back pain. (Tr. 220.) These pains seemed to ebb and flow throughout January. (Tr. 220-225.) As of January 30, 2007, Claimant continued to report overall improvement in terms of his strength and mobility. (Tr. 225.) By February 8, 2007, Claimant reported that "he will be beginning work conditioning next week. Overall, [Claimant] does report that he feels he is improving." (Tr. 226.)

7

The situation deteriorated, however, by the following month. (Tr. 227.) On March 7,

2007, Claimant entered the treatment facility and was "very agitated." (Tr. 227.) In a treatment

discharge report, it is noted that

> [Claimant] reports [that he] is feeling worse and [he is] having
> increased pain since beginning the program. He states that he will
> not be able to return to his concrete laboring work. . . . [Claimant]
> reports that he is prepared to discontinue [physical therapy] and
> continue with a home exercise program. . . . [H]e is not pleased
> with his current status and feels [that] he did not get the benefit of
> surgery [that] he was hoping/told he was going to get.

(Tr. 227.)

Claimant reported that he recently had been doing some remodeling work for his parents and

experienced severe back pain, "making him unable to sit at the dinner table." (Tr. 231.) The

report goes on to allege that additional therapy would not increase the odds of Claimant

returning to work, and that Claimant had "unrealistic expectations" of his surgery and his healing

time. (Tr. 227.) ORS recommended that Claimant seek additional care for his knees. (Tr. 227.)

Claimant was then discharged from physical therapy. (Tr. 227.) The following day, on March 8,

2007, Claimant's wife reported to RSC that Claimant "is going to seek part-time employment."

(Tr. 241.)

On April 23, 2007, Claimant reported to Advanced Pain Intervention ("API") and saw

Dr. A. P. Rosche for an evaluation. (Tr. 296.) Claimant complained that he was experiencing

lower-back pain, bilateral knee pain and "tingling" in his legs since his fusion surgery. (Tr. 296.)

"He complain[ed] that this condition [has] worsen[ed] over the last [four to five] months . . . in

his low[er] back, upper back, bilaterial shoulders, and even into his face," Dr. Rosche noted. (Tr.

296.)   Dr. Rosche suggested Claimant undergo another MRI and recommended that Claimant

continue use of his prescription medications, Lyrica and Mobic.

8

Later that day, Claimant went to Summit Radiology for a follow-up MRI on his lumbar spine. (Tr. 266.) Upon review of the imaging, Dr. Nestor Cuasay found the presence of "post surgical artifacts preclude optimal evaluation[,] especially in the lower lumbar levels." (Tr. 266.) "The L4-5 disc space level shows apparent enhancement in the left epidural space[,] with obstruction of the left neural foramen." (Tr. 267.) "Multilevel disc space narrowing is noted with multilevel neural foraminal stenosis. Central canal stenosis of varying degrees [is] present at multiple levels." (Tr. 267.)

Claimant returned to RSC on May 1, 2007. He stated that his symptoms were "in some ways better and in some ways much the same." (Tr. 247.) Claimant reported that his "hot[-]stabbing knife" sensation was gone, but he was experiencing a "needle-like sensation" in his lower extremities, torso, and face. (Tr. 247.) Dr. Roh believed that Claimant was "clearly better than he was [before the surgery]." (Tr. 247.) Yet, Dr. Roh thought Claimant was "very much disabled since he [cannot] do any type of work involving prolonged standing or sitting. (Tr. 247.) Later that day, Claimant saw Dr. A.P. Rosche to undergo a third epidural steroid injection in the L3-4 region. (Tr. 269, 300.)

Dr. Roh referred Claimant to Summit Radiology for a MRI on his spine May 7, 2007. (Tr. 263.) The MRI of Claimant's cervical spine revealed a mild bulge and a "small right posterolateral and foraminal disc protrusion" with "uncinate spurring" in the C3-4 region. (Tr. 263.) A "small right foraminal protrusion" was also present in the C5-6 region, resulting in a severe "right foraminal encroachment." (Tr. 263.) Dr. Michael E. Standnick's impressions included "[c]ervical spondylosis at C3-4." (Tr. 263.)

Claimant's thoracic spine was also examined that day. (Tr. 264.) After analyzing the MRI, Dr. Standnick found Spondylosis over the mid and lower thoracic levels. . . . A small right posterolateral protrusion . . . present at the T8-9 level without signigicant associated mass effect." (Tr. 264.) Dr. Standnick noted a "[l]arge multilobulated soft[-]tissue lesion to the left of [the] midline at the T5 level, most compatible with a large sebaccous cyst." (Tr. 265.)

On May 10, 2007, Claimant returned to Dr. Rosche at API for a follow-up evaluation. (Tr. 298.) Dr. Rosche noted that the MRIs of Claimant's lumbar and cervical spine "demonstrate multilevel discopathies without cord changes or dramatic cord impingement." (Tr. 298.) "[P]otentially[,] his condition is related to his inflammatory component neuraxial spine." (Tr. 298.) "[Claimant] may need a neurologic assessment . . . to help find out some of the diagnostic parameters involved," the doctor suggested. (Tr. 298.)

On May 22, 2007, Claimant's residual functional capacity ("RFC") assessment was completed by state agency physician Dr. Ernst Bone. (Tr. 284.) Dr. Bone found that Claimant could

- occasionally lift and carry twenty pounds
- frequently and carry lift ten pounds
- stand or walk for at least two hours in an eight-hour day
- sit for a total of six hours in an eight-hour workday
- push or pull any weight as shown for lift and carry
- occasionally climb ramps and stairs
- never climb ladders, ropes, or scaffolds
- frequently balance
- occasionally stoop, kneel, crouch, and crawl

(Tr. 285.)

10

There is no indication within the record that Dr. Bone had physically examined Claimant.
Therefore, this court assumes that Dr. Bone based his RFC findings on Claimant's medical
record.

On June 19, 2007, Claimant's orthopedic surgeon, Dr. Roh, wrote an opinion regarding
his opinion of Claimant's limited abilities. (Tr. 321.) He states that Claimant "is totally disabled
from any type of work." (Tr. 321.) "[Claimant] is plagued with persistent neuropathic
symptoms[,] as well as axial lumbar back pain and bilateral knee pain." (Tr. 321.) Dr. Roh could
not "foresee any job that would suit his current physical status and limitations." (Tr. 321.)

Upon a reference from Claimant's general practitioner, Dr. Jared S. Ko, neurologist Dr.
Paul L. Grindstaff evaluated Claimant at the Center for Neurology in Crystal Lake, Illinois on
August 20, 2007. (Tr. 315.) "Clinical evaluation . . . was consistent with cervical and lumbar
radiculopathy." (Tr. 315.) In Dr. Grindstaff's opinion, Claimant "has significant neurological
dysfunction from multilevel cervical and lumbosacral root involvement, secondary to
degenerative disc disease. His symptoms . . . impair his ability to perform even sedentary work
and[,] from a neurological standpoint[,] he is disabled." (Tr. 315.)

On October 15, 2007, Dr. Ko reported that although Claimant's surgery was "somewhat
successful," Claimant "started developing a strange tingling and burning sensation in . . . both
lower extremities[,] posteriorly and anteriorly. Since that point in time, [Claimant] has been
struggling with his pain." (Tr. 316.)

Claimant had an appointment with his surgeon, Dr. Roh, on September 25, 2007. (Tr.
326.) Claimant's "torso and hip paresthesias are controlled with Lyrica, although he is still
having paresthesias down his thighs." (Tr. 326.) Dr. Roh wrote that he "still consider[s]
[Claimant] to be fully disabled because he cannot stay in any one position for very long." (Tr.

11

326.) "I honestly do not think that he will be able to return to any type of significant work." (Tr. 326.)

Later, on November 8, 2007, Claimant again saw Dr. Roh for a follow-up appointment. (Tr. 325.) Dr. Roh noted that Claimant had "good strength in [his] lower extremities" and that the surgical incision had healed. (Tr. 325.) During the visit, Dr. Roh told Claimant that he still considered Claimant to be disabled due to his persistent myofascial and neuropathic symptoms. (Tr. 325.)

Dr. Grindstaff saw Claimant on February 26, 2008. (Tr. 344.) Claimant complained of paresthesia and pain in his legs and thighs, and "focal back pain." (Tr. 344.) Dr. Grindstaff's impression was that Claimant had "extensive spinal degeneration with multilevel radiculopathy in the cervical and lumbar spine." (Tr. 345.)

In an RFC questionnaire that detailed Claimant's ability to do work-related activities, signed on April 30, 2008, Dr. Ko found that Claimant could

- occasionally lift and carry ten pounds
- frequently lift and carry less than ten pounds
- stand and walk no more than two hours in an eight-hour workday
- sit for approximately two hours in an eight hour workday
- sit for forty-five minutes without changing position
- stand for fifteen minutes without changing position
- occasionally climb stairs and twist
- never stoop, bend, crouch, or climb ladders

(Tr. 318-320.)

Additionally, Dr. Ko stated that Claimant must have the opportunity to

- walk around every thirty minutes
- walk for a five minute period each time
- shift at will from sitting to standing and walking

12

(Tr. 318-320.)

However, Dr. Ko found that Claimant would not need to lie down at unpredictable intervals during a work shift. (Tr. 319.) Dr. Ko could not anticipate how often Claimant's impairments would cause him to be absent from work, stating that it "would depend on the type of work." (Tr. 320.)

On the day before his ALJ hearing, May 27, 2008, Dr. Roh filled out the same form as Dr Ko. (Tr. 468.) Dr. Roh found that Claimant could

- occasionally lift and carry twenty pounds
- frequently lift and carry ten pounds
- sand and walk no more that four hours in an eight-hour workday
- sit for approximately four hours in an eight-hour workday
- sit for twenty minutes without changing position
- stand for fifteen minutes without changing position
- occasionally climb stairs, twist, bend, and stoop
- never crouch or climb ladders

(Tr. 468-9.)

Additionally, Dr. Roh found that Claimant must have the opportunity to

- walk around every twenty minutes
- walk for a five minute period  each time
- shift at will from sitting to standing and walking
- lie down at unpredictable intervals during a work shift

(Tr. 469.)

On average, Dr. Roh anticipated that Claimant's impairments would cause him to be absent from work more than three times every month. (Tr. 470.)

13

**M. Knee Pain**

Claimant began experiencing knee pain in January of 2007, while participating in physical therapy at ORS. (Tr. 220.) At the time of his discharge at ORS in March of that year, his therapist noted that Claimant "continue[d] to have extremely limited gait mobility, primarily due to his knees." (Tr. 227.) "He will likely have to seek care for his knees," she added. (Tr. 227.)

Claimant discussed his knee pain with Dr. Roh on May 1, 2007. (Tr. 247.) Dr. Roh "admonished [Claimant] from neglecting [his knees] because the [pain] will affect his posture and lifting technique." (Tr. 247.) The topic of "total knee replacement" was mentioned briefly, but Claimant was reluctant to consider it. (Tr. 247.) Later that month, on May 22, 2007, Claimant received a right-knee steroid injection, as recommended by Dr. Rosche. (Tr. 299.)

Claimant had an evaluation of his knees on June 4, 2007 by Dr. Wayne Paprosky. (Tr. 302.) Claimant informed the doctor that he had difficulty with his knees for approximately ten years: "[h]e has pain in the front of the knee and inside of the knee[,] bilaterally. He has pain with walking and standing[;] and it is much worse with walking." (Tr. 302.) His right knee had historically given him more discomfort than his left. (Tr. 302.) However, Claimant did mention that his recent right-knee steroid injection alleviated some of his pain. (Tr. 302.)

Upon review of the x-ray radiographs taken that day, Dr. Paprosky found "severe tricompartmental varus gonarthrosis with [a] complete loss of tibiofemoral joint space medially bilaterally[,] as well as subchondral sclerosis and osteophyte formation." (Tr. 302.) Claimant had

14

similar changes in the other two compartments, and "significant osteophyte formation in all three compartments." (Tr. 302.) Following the evaluation, Claimant indicated that he was ready to pursue surgical treatment, beginning with a total right-knee arthroplasty. (Tr. 303.)

On a follow-up evaluation on June 5, 2007, Dr. Rosche reported that the right-knee injection was "markedly beneficial for [treatment of] pain," and Claimant then elected to undergo the same treatment for his left knee that day. (Tr. 301.)

On September 4, 2007, Claimant underwent a "right total knee arthroplasty." (Tr. 409.) A "left total knee arthroplasty" took place soon afterward on October 9, 2007. (Tr. 417.) Following the surgeries, Claimant participated in physical therapy at the AthletiCo facilities in Lake in the Hills, Illinois. (Tr. 410.) By and large, Claimant's therapy treatment consisted of "ice and heat

. . ., exercises of stretching, range of motion, . . . balance, proprioception, manual therapy, gait training, and [a] home exercise program." (Tr. 410.) His therapy goals were summarized as follows:

- improve bilateral knee flexion to 115 degrees
- improve bilateral knee extension 0-2 degrees
- improve the strength of his quadriceps and hamstrings

(Tr. 410, 417.)

By October 24, 2007, Claimant reported he was having "0/10 pain throughout his right knee and [felt] some stiffness in his right knee." (Tr. 416.) His pain in his left knee at the time was reported to be "2/10." (Tr. 416.) Claimant reported difficulty bending his knee on the left more than the right." (Tr. 416.) However, Claimant also stated that he had been "weaning down the use of his [pain] medications." (Tr. 416.) Claimant's physical therapist, Loriann M. Larson, found that Claimant had "deficits," including an inability to ascend and descend stairs with

15

"normal mechanics," to kneel or squat, and ambulate without the use of an assistive device. (Tr. 417.) Ms. Larson thought continuing physical therapy was "medically necessary to improve [Claimant's] bilateral knee range of motion, strength, proprioception, [and] in order to facilitate return [of] functional mobility tasks." (Tr. 417.) Yet, she noted that Claimant's prognosis was good, "secondary to his motivation." (Tr. 417.)

Claimant saw Dr. Paprosky for a post-operative follow-up appointment on November 11, 2007. (Tr. 441.) Claimant appeared to be "doing very well." (Tr. 441.) Dr. Paprosky noted, "[Claimant] is able to ambulate independently without any assistive devices. He can toe-walk and heel-walk with no problems. He is stable to varus and valgus stress, [and] stable to anterior posterior stress." (Tr. 441.) Claimant's knees continued to improve throughout the following months. (Tr. 443.)

Claimant continued physical therapy through January 14, 2008, when Ms. Larson reported that Claimant had met all of his therapy goals, except improving his "left[-]knee flexion to 115 [degrees]." (Tr. 431.) Ms. Larson discharged Claimant from AthletiCo and placed Claimant on a home exercise program consisting of "flexibility, range of motion, and hip and knee . . . exercises." (Tr. 431.)

When Claimant saw Dr. Paprosky on April 3, 2008 for his six-month follow-up appointment, he complained of some soreness in his knees "when he first gets up after sitting for a long period . . . and discomfort when he kneels for any extended period." (Tr. 445.) Dr. Paprosky reviewed Claimant's x-rays, that showed Claimant's total knee arthroplasty components to be in good position[,] with no evidence of any complication." (Tr. 445.) The doctor warned Claimant that he would not "ever" feel much better kneeling anymore, that such

16

activity should be avoided, and Claimant's soreness should improve with further conditioning. (Tr. 445.)

## V.     <u>Standard of Review</u>

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner."). The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly

17

articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.   **Framework for Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner normally proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.

After the Commissioner makes a finding of a closed period of disability, the ALJ must also proceed through an eight-step process to determine if a claimant's disability continues. 20 C.F.R. § 404.1594(f). At Step One, the ALJ should determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If the claimant is, then the ALJ will

18

find that the disability has ended. *Id.* If not, the ALJ will proceed to determine whether the claimant has an impairment or combination of impairments which meets or medically equals the severity of an impairment. If the claimant does not have an impairment that meets or equals one of the Listings, the ALJ must determine whether there has been medical improvement. 20 C.F.R. § 404,1594(f)(3). Medical improvement is defined as

> any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528).

> 20 C.F.R. § 404.1594(b)(1)

If the ALJ finds that there has been medical improvement, he or she must then determine whether it is related to the claimant's ability to do work. 20 C.F.R. § 404.1594(f)(4). The ALJ must then determine if any exceptions to the medical improvement finding would apply. 20 C.F.R. § 404.1594(f)(5). If none apply, the ALJ should decide whether all of the claimant's current impairments in combination are severe. 20 C.F.R. § 404.1594(f)(6). If they are not, then the claimant is not disabled. If they are severe, then the ALJ must determine a residual functional capacity based on the current impairments and decide whether the claimant can perform past relevant work. 20 C.F.R. § 404.1594(f)(7). Finally, if the claimant is not found to be able to perform any of her past relevant work, then the ALJ must make a determination whether other work exists that the claimant can perform in the same manner as described at Step Five in the preceding paragraphs. 20 C.F.R. § 404.1594(f)(8). If the claimant can perform other work, then he is no longer disabled. The court will analyze the ALJ's consideration of these

19

factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII.   <u>Analysis</u>

The parties do not dispute the ALJ's finding that Claimant was disabled during a closed period of time between his alleged onset date of March 29, 2007 and May 27, 2008. There is substantial evidence in the record to support such a finding. Therefore, the only issue before the court is whether the ALJ appropriately applied the eight-step process when determining that Claimant did not have a continuing disability beyond May 27, 2008.  Initially, Claimant argues that the ALJ's finding of medical improvement is not supported by substantial evidence.

### A.   Step Four: Is the ALJ's finding of medical improvement supported by substantial evidence?

In his opinion, the ALJ found that from August 5, 2006 through May 27, 2008, Claimant could not perform the following tasks:

- stand or walk for more than two hours in an eight-hour workday
- occasionally lift or carry twenty pounds
- frequently lift ten pounds
- frequently stoop, crouch, crawl, and kneel
- complete a normal workday without the opportunity to lie down several times

(Tr. 19.)

Therefore, the ALJ concluded that there were no jobs that existed in significant numbers in the national economy that the Claimant could have performed; finding Claimant disabled from August 5, 2006 through May 27, 2008. (Tr. 23.)

20

The ALJ then determined that Claimant was not disabled after May 27, 2008. (Tr. 27.) The ALJ found that medical improvement had occurred as of the day preceding Claimant's ALJ hearing: "the undersigned finds that [Claimant's RFC] has increased. More specifically, [Claimant] would no longer be required to lie down several times during the workday." (Tr. 27.)

The ALJ's RFC determination for the period following May 27, 2008 was almost identical to his prior RFC, except for the elimination of the requirement that Claimant must be allowed to lie down. (Tr. 24.) "At the hearing on May 28, 2008, [Claimant] testified to a significant range of daily activities, indicating medical improvement . . . . Furthermore, since the date of filing his application [for disability benefits], [Claimant] underwent bilateral knee replacement surgeries with good results," the ALJ reasoned. (Tr. 24.)

It is clear from the record that Claimant's testimony regarding his daily activities was a cornerstone of the ALJ's decision. Claimant argues that the ALJ omitted the fact that Claimant must take a substantial rest from his activities at mid-day. This discrepancy, he asserts, is a critical error.

The ALJ summarized Claimant's testimony in his opinion: "[Claimant] will return home at noon to take his medication, sit and rest[,] and . . . he does not always sleep. [Claimant] also stated he will try to do yard work or more in his workshop until about [four]. . . ." (Tr. 25.) In contrast, according to the transcript the Claimant actually testified as follows: "by about noon . . . I usually go in the house and I end up having to sit down and rest. Sometimes I fall asleep and take a nap[;] sometimes I don't. But[,] usually[,] I take a [two-] hour break." (Tr. 40.) He later continued, "I don't [lie] down in bed, . . . but sit down in . . . my recliner and . . . just take an hour, hour and a half [long] break." (Tr. 40.)

21

The ALJ found Claimant's entire testimony to be "very credible." (Tr. 25.) It is undisputed that Claimant said that he does not lie down in his bed everyday. (Tr. 40.) He did claim, however, that he must sit in his recliner for at least an hour; perhaps up to two hours daily. (Tr. 39-41.) Sometimes he falls asleep; sometimes he does not. (Tr. 40.) His position may not be prone, exactly. Nevertheless, Claimant's testimony was that he always sat in a reclining chair to rest for a significant period of time during the average day. (Tr. 39-41.) The ALJ's reluctance to recognize the crucial fact that Claimant must rest for an extended period throughout the day is critical. Undoubtedly, such a key fact could have a direct effect on Claimant's RFC and his ability to perform substantial gainful activity.

The Commissioner counters that the ALJ had explicitly recognized the fact that Claimant needs to sit down and rest at noon everyday. The court agrees. Nevertheless, the critical factor here is not whether Claimant rests, but the question of how long Claimant must rest during the average workday. The ALJ does not address that important issue in his opinion. This court finds that there is not a logical bridge between the RFC and Claimant's testimony concerning this issue.

In a similar instance of exclusion, the ALJ acknowledges that "[e]very couple of weeks, [Claimant] may have a day where he wakes up and feels like he may have overdone it." (Tr. 25.) The ALJ's summary is incomplete as it leaves out a critical fact of Claimant's testimony. Claimant's actual testimony was that there were days where he needed to "sit around and . . . do nothing . . . because [his back and neck are] sore. . . . Sometimes, if [he really overdoes] it, it might be every couple of weeks [that he will] have a [few] days like that." (Tr. 40.) If Claimant's testimony was "very credible," then such a circumstance would also need to be considered in determining Claimant's RFC. Yet, the ALJ overlooks it entirely. The ALJ's exclusion of the fact

22

that Claimant needs to occasionally take a day off to "do nothing" because of his pain is noteworthy and should have been addressed.

The ALJ seems to cite to the following medical evidence to support a finding of medical improvement as it relates to Claimant's ability to work:

- Dr. Roh concluded that Plaintiff's "severe and intractable lumbar radiculopathy has resolved completely." (Tr. 325.)
- Claimant met all but one of his physical therapy goals from September to December 2007. (Tr. 431.)
- Claimant reportedly told Dr. Paprosky that his knees "felt much better" in April of 2008 and there was no evidence of further complications. (Tr. 445-446.)
- Dr. Ko opined that Claimant would not need to lay down during the workday. (Tr. 319.)

Claimant submits that such limited medical evidence, taken out of context, does not amount to substantial evidence. This court agrees that the ALJ is unable to support his finding of medical improvement with such evidence.

Taken in its entirety, Dr. Roh's statement is as follows: "I explained to [Claimant] that at this time[,] *I do consider him to be disabled*. It is true that the severe and intractable lumbar radiculopathy has resolved completely, *but these other symptoms have left him similarly disabled*." (emphasis added) (Tr. 325.) The statement that the Commissioner relies on as evidence to support his finding that Claimant is no longer disabled is literally surrounded by two statements that appear to communicate the exact opposite conclusion. Moreover, it must be noted that the selected statement is dated November 8, 2007. (Tr. 325.) According to the ALJ's own findings, Claimant was *disabled* on November 8, 2007. Now, however, it is submitted as evidence that supports his conclusion that Claimant was not disabled as of May 28, 2008.

23

Indeed, on May 27, 2008, the very day before Claimant's hearing, Dr. Roh clearly reports his

findings that Claimant must have the opportunity to lie down at unpredictable intervals during a

work

shift and that Claimant's impairments would cause him to be absent from work more than three

times every month. (Tr. 469-470.) . Dr. Roh's statement, utilized in such a way, cannot

constitute substantial evidence that Claimant had undergone medical improvement relating to his

ability to work.

The second piece of medical evidence that the Commissioner cites is the finding that

Claimant met all but one of his physical therapy goals from September to December 2007. (Tr.

431.) That statement appears to be accurate and complete. However, Claimant's rehabilitation

goals were limited to his knee flexibility and pain only. (Tr. 431.) They patently did not have any

relation to his back-pain symptoms. (Tr. 431.) Claimant did participate in physical therapy after

his spinal fusion surgery. (Tr. 218.) Remarkably, he did not complete the program as he felt it

was making his back pain worse. (Tr. 227.)  He was discharged in March 2007. (Tr. 227.)

Much the same can be said of the ALJ's third piece of medical evidence. Dr. Paprosky

served as Claimant's knee surgeon. (Tr. 445.) Neither party seems to dispute the finding that

Claimant's knees have significantly improved. Dr. Paprosky's statement may serve as substantial

evidence of medical improvement in Claimant's knee pain. Yet, it does not address Claimant's

back pain at all.

The ALJ's fourth piece of medical evidence is that Dr. Ko, Claimant's primary care

physician and general practitioner, opined that Claimant would not need to lay down during the

workday as of April 30, 2008. (Tr. 319.) The ALJ appears to take this opinion along with

Claimant's testimony that he does not need to lay down in bed during his rests as substantial

24

evidence of medical improvement as of May 27, 2008. It must be noted that Dr. Ko's report is much more restrictive than the ALJ's RFC. (Tr. 24, 319.) There are conflicting medical reports on record, but the issues therein will be discussed later in this opinion. Nevertheless, the fact that one doctor believes that Claimant does not need to lie down during the workday is not alone substantial evidence to support a finding of medical improvement.

In his reply brief, Claimant suggests that a vocational expert ("VE") would testify that Claimant's rest requirements would exceed the break-time allowed by employers, and submits that the case should be remanded for testimony from a VE. In this case, the ALJ did not call on a VE to testify. It is not required that a VE testify at every ALJ hearing; however, a VE's testimony concerning these issues may be helpful in resolving them.

The ALJ's decision to fix the date of medical improvement as May 27, 2008 is not supported by substantial evidence. The ALJ based his opinion on Claimant's testimony on May 28th as to how Claimant "spends his days." But, without any questioning concerning the period of time these routines may have begun, the ALJ provides little reasoning to support the finding that May 27, 2008 was indeed the date of medical improvement. There is no basis in the record to conclude that Claimant was disabled on May 26th but not on May 27th. The ALJ is unable to build a logical bridge between the evidence and his conclusion. Alas, the date appears to be capricious. Based on the evidence submitted to this court, Claimant may well have tinkered in his workshop, helped with household chores, or performed a number of other activities months before the date of his hearing. For example, Claimant alleged to have worked on remodeling projects for his parents while he was in physical therapy, and he was reportedly looking for part-time work in March of 2007. (Tr. 231, 241.) Yet, the ALJ found him disabled during that time.

25

The ALJ has failed to identify substantial evidence that would support a finding that Claimant was disabled on May 27, 2008, but not on the following day.

### E. The ALJ failed to apply the "treating physician rule" factors pursuant to 20 C.F.R. § 404.1527(d) when he disregarded the opinions of Claimant's treating physicians in favor of the opinion of a state agency physician.

In addition, Claimant argues that the ALJ failed to accord adequate weight to Claimant's treating physicians, Dr. Roh, Dr. Ko, and Dr. Grindstaff. Instead, Claimant submits, the ALJ improperly relied on the opinions of Dr. Bone, a state agency physician.

Generally, an ALJ will give more weight to the opinion of treating sources because of the likelihood that they are most able to provide a "detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings" or from consultative examinations. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). However, controlling weight may not be given to a treating source's medical opinion unless it is "not inconsistent" with the other substantial evidence in the record. SSR 96-2p. In all circumstances, the ALJ should give good reasons for the weight assigned to a treating physician. 20 C.F.R. § 404.1527(d)(2).

The ALJ acknowledged that several of Claimant's "other treating sources have opined that [Claimant] is limited to a greater extent than determined by [the ALJ], or incapable of performing sustained activity." (Tr. 26.) He declined to accord those opinions significant weight, providing the following reasons:

26

> For one, said opinions as to [C]laimant's limited abilities clearly
> contrast with [his] actual abilities as he testified to in describing
> his daily activities, at least as of May 28, 2008. Second, the
> opinions as to [C]laimant's treating sources contrast with one
> another. For example, [C]laimant's primary physician, Jared Ko,
> M.D., opined that [C]laimant would not need to lie down during
> the workday . . . In contrast, [Claimant's spine surgeon,] Dr. Roh
> opined that [C]laimant would have to lie down . . . . Based on the
> conflicting evidence of record, the undersigned declines to adopt
> said opinions, or accord significant weight to [Dr. Roh and Dr.
> Grindstaff's] opinions.

(Tr. 26.)

State agency physician, Dr. Bone found that Claimant was limited to light work with postural

limitations. (Tr. 285.) The ALJ accorded significant weight to the opinion of Dr. Bone, in that it

was "in accordance with the evidence of record, including Claimant's testimony, as of May 28,

2008. (Tr. 27.)

When an ALJ does not give controlling weight to the opinion of a treating physician, he

should apply the following factors to determine how much weight to give the opinion: (1) the

length of the treatment relationship and the frequency of examination; (2) the nature and extent

of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the

opinion with the record as a whole; (5) the specialization of the treater; and (5) any other factors

which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).

The ALJ did not adequately perform the steps outlined above in disregarding the

opinions of Claimant's treating physicians in favor of the state agency doctor's opinion. Surely,

"a claimant is not entitled to disability benefits simply because [his] physician states that [he] is

27

'disabled.'" *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001.) However, the ALJ must identify supporting evidence in the record and build a "logical bridge" from that evidence to the conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). These factors supplied by 20 C.F.R. § 404.1527(d), mentioned above, are in place to prop up and support that logical bridge. Considering the ALJ's reasoning, the court is not convinced that the ALJ adequately supported his position that the treating physicians' opinions "clearly contrast" with Claimant's testimony. Furthermore, the court is not convinced that simply because one doctor's opinion may differ from another's concerning the Claimant's need to lie down during the workday, it supplies an ALJ sufficient evidence to discount all three treating physician's respective opinions concerning Claimant's ability to perform substantial gainful activity. The court finds that the ALJ's conclusion is not supported by substantial evidence.

## VIII.   Conclusion

Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied.  This matter should be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) with instructions that the Commissioner conduct further administrative proceedings in accordance with this opinion.

**E N T E R:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: January 22, 2013

28

29